**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Walter Mark CHITTY, Defendant–
Appellant.**

**No. 90–4111.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 24, 1994.

John P. DuBose, Pensacola, FL, for defendant-appellant.

Randall J. Hensel, Asst. U.S. Atty., Pensacola, FL, for plaintiff-appellee.

Before ANDERSON and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

This case arises from the importation into various places in Florida, by airplane, of marijuana imported from Belize, Central America, over a period from 1986 to 1990.

Walter Mark Chitty was convicted of conspiracy to import (Count I) and conspiracy to possess with intent to distribute (Count II) 1,000 or more kilos of marijuana between September 1986 and November 1990. Also he was convicted on two substantive counts, importation from Belize of 100 or more kilos of marijuana (Count VII) and possession with intent to distribute 100 kilos or more (Count VIII). He was sentenced to 120 months on each of Counts I and II, concurrent, and 120 months on each of Counts VII and VIII, concurrent with each other and with the sentences on Counts I and II.

There was evidence that on or about June 18, 1987 900 pounds of marijuana brought from Belize was flown into Compass Lake Hills, a subdivision developed in a remote rural area of Jackson County, North Florida, but having no structures. It was the fourth or fifth shipment flown in by conspirators since December 1986. The marijuana was offloaded, with Chitty not present, and taken in trucks approximately 15–20 miles to a remote farmhouse occupied by Chitty as tenant to be stashed overnight. That night witness W.A. Nunnally saw Chitty walking around "outside the perimeter" at the farmhouse, holding a radio scanner. Chitty was asked if he needed help and responded that everything was under control. Nunnally was

standing next to Chitty when they engaged in this conversation. The following morning the marijuana was moved out in cars by purchasers.

### I. Severance

■ The court did not err in denying Chitty's request for severance. Nunnally was the critical witness implicating Chitty. Chitty raised the question of whether Nunnally was biased against a co-defendant Gibbs and whether that bias might have affected Nunnally's testimony relating to Chitty. Nunnally testified in a proffer, outside the presence of the jury, that he and Gibbs had participated together in a murder. The theory of counsel for Chitty was this: Nunnally feared that Gibbs would tell police that he (Gibbs) had committed the murder, therefore, Nunnally was motivated by bias against Gibbs and wished to incriminate Gibbs in the marijuana importation charged in this case. Accordingly, Chitty should be permitted to cross-examine Nunnally about the alleged murder because Nunnally's possible bias against Gibbs was relevant to his overall credibility and therefore to his testimony describing Chitty's participation in the marijuana importation. The court ruled that it would permit cross-examination of Nunnally about a prior murder in which a third person was involved, but that Nunnally could not state Gibbs' name. Chitty says that the court's ruling denied him the right to confront Nunnally with full cross-examination and, therefore, required that he be granted a severance. There is not before us whether Gibbs might have examined Nunnally about possible bias against Gibbs. The court correctly saw that Chitty's connection with Nunnally's alleged bias against Gibbs was too tenuous to require that he (Chitty) be separately tried. Chitty's other contentions about severance (spill-over, strong versus weak evidence) have no merit.

### II. Sequestration

■ The rule of sequestration was not violated by the fact that Nunnally and another witness, while in jail before trial, read each other's grand jury testimony.

### III. Sufficiency of evidence— convictions and sentences

■ Chitty moved for judgment of acquittal and, on appeal, questions the sufficiency of the evidence on Counts I and II, the conspiracy counts.[1] Also he questions the imposition on Counts I and II of the minimum mandatory sentences of § 21 U.S.C. § 841(b)(1)(A)(vii), which, pursuant to the recommendations in the PSI, were imposed on the basis that the convictions on these counts each involved more than 1,000 kilograms of marijuana.

The convictions under Counts I and II must be affirmed. Chitty's participation in the June 1987 load, by itself, was sufficient evidence that he joined in and participated in the conspiracy. But the evidence does not support criminal responsibility by Chitty for anything occurring after that date, nor may events after that date be the basis for sentencing.

In late July 1987 a planeload was flown into Santa Rosa County, Florida, some 125–150 miles to the west of Compass Lake Hills. It involved 600 pounds from the same source in Belize, the same pilot as before, and a different plane though rented from the same source. Some of the participants had been involved in some of the previous shipments.

During August 1987 a shipment of 640 pounds was flown into the property of a large hunting club in Walton County, 75 miles more or less west of Compass Lake Hills. Involved were the same pilot and persons who had participated in some of the earlier shipments. The plane was abandoned where it landed because the engine would not restart.

In 1989 a load was flown into Opalocka, Florida, several hundred miles to the south, near Miami. The amount of marijuana is unknown.

In mid–1990 the last shipment, some 600 pounds, was made to Liberty County, Florida, some 25–50 miles east of Compass Lake Hills. For this shipment a plane was stolen

1. He does not question the sufficiency of evi-　dence under Counts VII and VIII.

from an airport in south Alabama and abandoned after use.

■ The government sought at trial, and seeks on appeal, to establish the scope of Chitty's criminal responsibility and of his sentences for conspiracy by applying *Pinkerton v. U.S.*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). It recognizes that the minimum mandatory sentence for 1,000 kilos is only applicable if sufficient of the shipments after June 16, 1987 are cumulated with that shipment to produce a total of more than 1,000 kilos.[2]

■ In argument to the jury the prosecutor described the June load, pointed out the evidence of Chitty's presence at the stash house, and argued that from that point on Chitty was accountable for the actions of others in furtherance of the conspiracy. Tr. 9, p. 968. The PSI proposed that the June 1987 shipment be cumulated with all subsequent shipments:

> Mr. Chitty got into this conspiracy in June, 1987, and is held accountable for all of the marijuana involved in the conspiracy since that date. This involved four different occasions as documented above which amounted to 2,777 pounds or 1,262 kilograms of marijuana.

In this court the government makes substantially the same *Pinkerton* arguments that it made below and that the PSI accepted as controlling. A conspirator is responsible for conspiracy activities in which he is involved, and for drugs involved in those activities, and for subsequent acts and conduct of co-conspirators, and drugs involved in those acts or conduct, that are in furtherance of the conspiracy and are reasonably foreseeable to him. *U.S. v. Beasley*, 2 F.3d 1551, 1561 (11th Cir.1993); *U.S. v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993). The events after the June 1987 load do not meet these standards. There is no substantial evidence that Chitty should have reasonably foreseen additional shipments of marijuana by conspirators. The evidence tells us that the house Chitty rented was used as a stash house for one

shipment for one night and that Chitty was present that night and performing what could be found to be lookout or security duty in the vicinity of the house. He was a caretaker, occupying the house for the owner, to look after it and to care for horses and cattle kept at the farm. There is no substantial evidence of who arranged for the use of the house and what representations were made to secure that use. Chitty had a less than intimate friendship with conspirator Gibbs, and he had merely met Nunnally on another occasion in another part of Florida.

There is no evidence that Chitty knew anything of the conspiracy's past operations, or the identity of conspirators other than Nunnally and Gibbs, or where the marijuana came from, or how it was imported, or how it was moved from the point of import to the farm, or that future shipments were contemplated and if so by what means, or in what quantities or by whom. At most, the evidence showed Chitty to be a participant in one-shot, transitory storage of a single shipment done by a conspiracy that operated in scattered multiple sites over nearly five years. No subsequent shipment was sent to Chitty's house nor did any subsequent flight touch down within many miles, nor did Chitty have any connection with any subsequent shipment.

Therefore, with respect to criminal responsibility, the evidence relating to Counts I and II was sufficient to submit to the jury only because of testimony concerning the June load. Evidence of subsequent events did not meet *Pinkerton* standards of foreseeability. With respect to sentencing, for the same reasons, applying the *Pinkerton* standards by analogy, the only marijuana that could be counted was that brought to Compass Lake Hills in June 1987.

### IV. Conclusion

The convictions under all counts are AFFIRMED. The sentences under Counts VII and VIII, which are not questioned on appeal, are AFFIRMED. The sentences under Counts I and II are VACATED and the

---

**2.** The government does not contend that shipments that occurred before June 16, 1987, are to be included in the cumulation. Nor does it assert that any one or more specific post-June 1987 shipment[s] are to be cumulated. Rather it cumulates all in gross pursuant to the same asserted legal theory.

cases REMANDED to the district court for resentencing on those counts under pre-Guidelines standards.[3]

3. Sentencing Guidelines became effective November 1, 1987.